Filed 8/3/21  P. v. Sanchez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C091125 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE016812) |
| v. | |
| LUCAS ANTONIO SANCHEZ, | |
| Defendant and Appellant. | |

A jury found defendant Lucas Antonio Sanchez guilty of the first degree murder of his girlfriend Jennifer Rutter.  In a bifurcated proceeding, the jury found defendant sane at the time of the murder.  On appeal, defendant makes several evidentiary and instructional claims of error alleged to have occurred at both the guilt and sanity phases of trial.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant and Rutter met while in a residential treatment program for their methamphetamine addictions.  They started a romantic relationship and together they left

1

the program early. The two made their way to Sacramento, where they both relapsed. On September 9, 2017, defendant and Rutter were staying at LaQuinta Inn. In the morning hours, multiple guests complained about defendant knocking on their hotel room doors. When defendant was approached by a LaQuinta Inn employee, he did not respond to her questions and gave her a look that made her uncomfortable. She went back to the front desk and contacted the Sacramento County Sheriff's Department. When Rutter and defendant later tried to extend their stay at LaQuinta Inn, they were told they could not stay at the hotel another night.

Defendant and Rutter went across the street to the Crowne Plaza Hotel to get a room. At approximately 3:00 p.m., on September 10, 2017, they were seen arguing in the parking lot. Both of them were yelling and cursing and defendant threatened to kill Rutter. At no point was the argument physical. Defendant and Rutter were later seen arguing in the lobby. They were both acting erratic and appeared under the influence of drugs.

Between 7:00 and 8:00 p.m. that night, Rutter's friend Casey H. picked her up for a night together. Just prior to being picked up, Rutter texted Casey stating that she "*walked out of man's room and left him. I'm feeling suicidal myself.*" Around this same time, Rutter texted a friend "*I'm fucked with no money, no cigs, and want to go back to dope bad.*" Rutter also discussed her recent experience living with defendant at the friend's sister's house. "*I feel so bad and guilty for [your sister] finding a pipe wipe, I think. I'm hella mentally and emotionally drained. Fuck.*" Rutter further told the friend she was "*posting up on the side of the building to smash him.*" Rutter continued: "*I'd never bring him back [to your sister's house]. I'm going through it. Between prison, a program, and back to Sac. A lot of shit has happened. Plus my family disowning me again.*"

After being picked up by Casey, Rutter and Casey went to Casey's house for a few hours and then they went to another location where they both smoked methamphetamine.

During their time together, Rutter told Casey she was having problems with defendant and discussed her intention to end their relationship. Rutter said the relationship had been great when they were both clean, but since they relapsed, defendant had changed drastically and this was not what she wanted. Rutter said that both she and defendant had relapsed and she was upset with defendant's behavior. Rutter showed her friend photographs of the back of defendant's neck appearing red. She said the redness was the result of defendant picking the back of his head. Rutter said that when returning to the hotel she was going to give defendant an ultimatum that he get clean and return to rehab or she would leave him. The entire time Casey and Rutter were together, Rutter was on her phone, either texting or making calls. At the end of the night, around 2:30 a.m., Rutter went back to her hotel room with the plan to shower and grab some belongings before returning to her friend's apartment.

During the time Rutter was with Casey, Rutter called and texted defendant's phone. There is no evidence defendant sent her a text message back. At 8:12 p.m., Rutter texted defendant, "*I don't want to leave you there. I'll come back if you want. . . . Just buy a car or truck tomorrow and we will go wherever. I'll stay clean with you. Come back to me Lucas.*" Three minutes later, Rutter texted, "*Fuck you, then. I'm not chasing you like no punk. Fucking lame. I care about you. I love you. I want you for life. I want Lucas, not who Lucas became.*" After ten minutes, Rutter wrote, "*Check it out. A bunch of us will come get you out that room, force you to quit picking and sleep.*" Sixteen minutes after that, Rutter questioned, "*I'll come back. Yes or no?*" Then, three minutes later, "*Why you yell at Mike? Fucking snap it together. Please. Now. If you love me and really want this to work, call me now.*" Then, around 8:50 p.m., Rutter messaged, "*Please let me know something. I'm in a fucking bind here. In trouble*" and "*Lucas, I don't want to be here without you. I'm scared. They are calling people over who I don't want to be around. I feel set up. You are not answering me. No one else is either. I need you.*" At 9:00 p.m., Rutter texted, "*Lucas, stop it. It's Jennifer. Pull*

3

*yourself together. I need you, babe. I need to go to you now. I am in a bad situation.*"
Two minutes after that, she messaged, "*I need to go now. I promise you on my kids' life it's bad. Answer me, please.*" Then three minutes later, Rutter said, "*Call me now. Fuck it. Text me.*" At 9:35 p.m., after a few other texts, Rutter texted, "*WTF, Lucas? I found a SUV for 15 hundred. Let's pack and go. Answer me. I need you now. WFT? I don't want to go to jail or have these problems here.*" Finally, at 10:12 p.m., Rutter texted, "*I guess I'm going to get our shit and bring it to a friend's right now.*"

Most of Rutter's calls went unanswered, but she and defendant connected for four minutes and 30 seconds around 11:00 p.m. and for one minute and 55 seconds at 11:16 p.m. Later that night, Shawn B. sent a text message to defendant that Rutter was in a bind and needed his help. Rutter had asked Shawn via text message to do so and also told him defendant had "been picking for 4 days straight. Hear voices n see things kinda got violent with me."

At midnight, defendant was seen at the elevators in the Crowne Plaza Hotel acting odd. He was repeating to himself "I messed up. I messed up. I fucked up" and appeared to have small blood spots on the bottom of his shirt. At approximately 2:30 a.m., Rutter returned to the room she shared with defendant at the Crowne Plaza Hotel.

Around 9:00 a.m., on September 11, 2017, multiple guests and Crowne Plaza Hotel employees heard yelling between a male and a female coming from defendant and Rutter's room. The yelling quickly escalated to unintelligible male screaming and loud pounding from the hallway outside of the couple's room. When guests emerged from their rooms to see what was going on, they saw defendant, dressed in only his boxer shorts, pacing in the hallway outside of his room holding a two-foot metal rod from the hotel room's closet. Rutter was naked, face down on the floor in the hallway with blood covering her head. Defendant was heard saying "*breathe, breathe*," "*somebody help me*," and "*oh shit. Oh God. Oh shit.*" Two Crowne Plaza Hotel housekeepers ran down the

4

hall and defendant followed them asking for the key to his room. The housekeepers did not give defendant a key and defendant fled down the stairs to the lobby.

In the lobby, Crowne Plaza Hotel management was responding to a complaint of screaming coming from defendant and Rutter's room. When defendant came down the stairs into the lobby, he encountered the general manager and chief engineer of the hotel. The chief engineer asked defendant to drop the metal rod and defendant complied. The general manager also told defendant to leave the premises and defendant complied. During the encounter, defendant's behavior was erratic and he did not look as though he knew where he was. Defendant appeared to be on drugs or suffering from a mental health issue.

Defendant walked out to the front of the Crowne Plaza Hotel where several hotel employees corralled him to the curb. Soon, law enforcement officers from various Sacramento-area agencies, who happened to be attending a training at the Crowne Plaza Hotel, took control of defendant. Like the Crowne Plaza Hotel employees, the officers corralled defendant to the curb. Defendant was distraught and fidgety. He was not crying but looked very disturbed. He was rocking back and forth and exhibiting rapid eye movements and teeth grinding. He also appeared as though he were on drugs, such as methamphetamine or cocaine.

While sitting on the curb, defendant said his girlfriend had tried to stab him and he had to kill her. Defendant specified that he grabbed a rod from the hotel room's closet and beat her with it. When told the sound of sirens was for his girlfriend, defendant responded "*I don't care. I want her to die.*" Defendant admitted to using drugs the day before, but did not specify which type. He also said "*I think I killed my girlfriend. She tried to stab me. I think I killed her.*" When deputies from the Sacramento County Sheriff's Department arrived, defendant told a deputy his girlfriend stabbed herself and stabbed him and then he hit her.

Rutter suffered multiple lacerations and innumerable skull fractures to her head and face inflicted by 7 to 10 impacts. The blunt force trauma caused bleeding to her brain and killed her. There was a large pool of blood on the bed in the hotel room and blood splatter leading out of the room to Rutter's body in the hall. No knife was discovered. In the trash can were many tiny pieces of tissue with blood spots on them, as if someone was using them to blot a sore.

In defense, defendant presented the testimony of a forensic psychiatrist who testified that defendant suffered from post-traumatic stress disorder and settled methamphetamine psychosis. As it related to the post-traumatic stress disorder, the forensic psychiatrist testified the term categorized a mental health disorder in people who have experienced some type of traumatic event and then have a number of psychological symptoms linked to the event. Symptoms of post-traumatic stress disorder include intrusive memories or intrusive recall related to trauma, avoidance, depression or feeling shut down emotionally, and increased reactivity or agitation. The symptoms can lead to the misinterpretation of threat cues, i.e., seeing a threat where one does not exist or believing something is a threat that is not.

It is common for post-traumatic stress disorder to occur alongside a substance abuse disorder. In defendant's case, he suffered from settled methamphetamine psychosis. Psychosis means "a break in reality," defined by thinking or perceiving something that is not real. Methamphetamine can cause psychosis, especially if a person uses the drug over a long period of time and of increased amounts, because of the way the drug interacts with the human brain. With time and prolonged use, methamphetamine damages brain cells. Over time, the damage may result in a person experiencing psychotic symptoms even when he or she is not using the drug. Defendant had been admitted to a psychiatric hospital on previous occasions. Each admission occurred after defendant had been using drugs.

A jury found defendant guilty of first degree murder and personal use of a deadly weapon. The jury later found defendant was legally sane during the commission of the murder.[1] The trial court sentenced defendant to 26 years to life in prison.

Defendant appeals.

## DISCUSSION

### I

### *Evidentiary Claims*

Defendant raises two evidentiary claims from the guilt phase of his trial. He first contends the trial court erred by admitting four prior acts of domestic violence under Evidence Code[2] section 1109. He next argues the trial court erred by admitting several of Rutter's statements under section 1250. "We review . . . evidentiary claims for abuse of discretion. [Citations.] 'A trial court abuses its discretion when its ruling "fall[s] 'outside the bounds of reason.' " ' " (*People v. Sisneros* (2009) 174 Cal.App.4th 142, 151.)

### A

### *Defendant Was Not Prejudiced By The Trial Court's*
### *Erroneous Admission Of One Prior Act Of Domestic Violence*

The prosecution offered and the trial court admitted five prior acts of domestic violence under section 1109. Those acts were testified to by Lorlyn C., defendant's prior girlfriend and mother of his child. On appeal, defendant challenges the admission of the prior acts occurring in Las Vegas, Hayward, and Fremont, and the one involving the dog.

---

[1]     Defendant raises two instructional error arguments pertaining to the sanity phase of his trial. Because those claims raise only legal questions we conclude lack merit, we do not recite the evidence admitted during defendant's sanity phase because it is irrelevant.

[2]     Further section references are to the Evidence Code unless otherwise indicated.

7

He does not challenge the prior act occurring in San Leandro. We agree with defendant, and the People, that the incident involving the dog should not have been admitted. However, we conclude its admission was harmless.

1

*Factual Background*

Lorlyn testified she and defendant met in 2004 and were in a relationship until 2009. The first instance of domestic violence between them occurred in Fremont in September 2006. At that time a friend invited Lorlyn out without inviting defendant. The lack of invitation turned into an argument between defendant and Lorlyn and defendant grabbed Lorlyn's phone and got physical with her. He pushed her and her head hit the wall, he also put his forearm on her neck and tried to hold her down. Lorlyn tried to call 911, but defendant hung up the phone. While defendant was not drunk during this incident, he would often drink heavily during their relationship and become violent.

The second instance of domestic violence occurred in Las Vegas sometime after the 2006 act of domestic violence but before 2009. While in Las Vegas, defendant and Lorlyn were drinking in a club when defendant started yelling at Lorlyn for putting used cigarettes in his drink. They left the club and defendant continued to yell at Lorlyn. Lorlyn caught a cab and went back to the hotel room, leaving defendant on the strip. Lorlyn went to sleep and woke up three hours later. Defendant was in the hotel room and angry. He hit her hard on her left ear, causing hearing damage.

After the Las Vegas incident but before 2009, defendant and Lorlyn went to a party in Hayward but had to leave because defendant was drinking heavily and fighting with people. While driving home, defendant grabbed the steering wheel from Lorlyn's control and jerked the car back and forth causing them to nearly get into an accident. When defendant and Lorlyn got home, defendant yelled at Lorlyn, pushed her to the

8

ground, and put his hands around her neck.  Lorlyn used her keys to scratch at defendant's face and neck.

The next incident of domestic violence occurred in February 2009 in San Leandro. At that time, defendant was drinking alcohol in the kitchen and Lorlyn was watching a video with her children on a laptop in their bedroom.  Defendant wanted Lorlyn to drink with him but she said she did not want to.  In response, defendant pulled her out of the bedroom, yelled at her, put his hands around her neck, and broke her laptop.

The last incident occurred in 2009 as well.  Lorlyn came home from church with her children and defendant was drunk and angry for some reason.  She disapproved of his drinking and he yelled at her.  Lorlyn told defendant she was going to leave him, and he grabbed the family's puppy and threw it into a busy street with the children watching. The children were hysterically crying.

At no point during these acts of domestic violence did defendant use a weapon or threaten to kill Lorlyn.

2

*The Court Did Not Abuse Its Discretion*

*By Admitting Three Prior Acts Of Domestic Violence*

Defendant contends the trial court abused its discretion by admitting the acts of domestic violence occurring in Fremont, Las Vegas, and Hayward because it did not consider that those acts occurred more than 10 years before the murder and thus should have applied the more heightened standard in section 1109, subdivision (e).  We disagree.

Section 1109 provides in relevant part:  "Except as provided in subdivision (e) . . . , in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.  [¶]  (e) Evidence of acts occurring more than 10 years before

9

the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

The parties agree the court was aware of its obligation to find the admission of evidence occurring 10 years before the murder warranted by the interest of justice. The parties also agree the court was aware the Fremont incident occurred more than 10 years before the murder and that the date of the Las Vegas and Hayward incidents occurred sometime between the Fremont incident in 2006 and 2009. We presume the trial court knows the law (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114), and we review its ruling not the underlying reasoning (*People v. Turner* (2020) 10 Cal.5th 786, 807). Thus, we imply the trial court found the admission of evidence regarding acts occurring 10 years before the murder was in the interest of justice. (*People v. Francis* (2002) 98 Cal.App.4th 873, 878 [An appellate court implies " 'all findings necessary to support the judgment, and [its] review is limited to whether there is substantial evidence in the record to support these implied findings' "].)

Moreover, that implied finding was not an abuse of discretion. As the trial court stated, defendant's prior acts of domestic violence were linked to his substance abuse, much like the charged murder. Indeed, the Las Vegas and Hayward incidents occurred after defendant had been drinking heavily and became angry and violent for minor or unknown reasons. To the trial court, the prior acts occurring in Las Vegas and Hayward served to demonstrate defendant's substance-induced behavior. Appellate courts have affirmed the admission of remote evidence under section 1109, subdivision (e), where the evidence of the prior acts was similar to the charged offenses. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 537-540 [affirming admission of evidence defendant shot two of his prior girlfriends approximately 18 and 14 years prior to the charged offense involving the defendant's shooting of a girlfriend]; *People v. Culbert* (2013) 218 Cal.App.4th 184, 192-193 [affirming admission of evidence defendant threatened his ex-

10

wife 11 years before the charged offense, since "[i]n both incidents, appellant confronted family members in a small room and threatened to kill them"].)

As for the Fremont incident, it did not involve defendant's consumption of alcohol. The court believed that incident relevant and not prejudicial because it involved the same victim and showed the nature of defendant's relationship with her. We agree. "[T]he 'interest of justice' exception [under section 1109, subdivision (e)] is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes . . . that the evidence was 'more probative than prejudicial.' " (*People v. Johnson*, *supra*, 185 Cal.App.4th at pp. 539-540; *People v. Megown* (2018) 28 Cal.App.5th 157, 168.) " '[I]n domestic violence cases, as in sex crimes, similar prior offenses are "uniquely probative" of guilt in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the "typically repetitive nature" of domestic violence. [Citations.] This pattern suggests a psychological dynamic not necessarily involved in other types of crimes.' " (*Megown*, at p. 168.)

Here, the Fremont incident was similar to defendant's other prior acts of domestic violence in that each one was precipitated by innocuous conduct causing defendant to become angry and violent. While defendant may not have been under the influence of a substance at the time, the Fremont incident, along with his other prior acts of domestic violence, demonstrated the repetitive nature of defendant's conduct such that it qualified as conduct targeted by section 1109. Thus, the trial court reasonably found the similarity between the incidents and their repetition over several years created a strong inference that defendant had a propensity to commit domestic violence.

3

*The Admission Of The Prior Act Involving The Dog Was Harmless*

Defendant contends, and the People agree, the trial court should have excluded the act of domestic violence involving the dog. We also agree. In *People v. Kovacich* (2011)

11

201 Cal.App.4th 863, 894-895, we concluded acts involving animal abuse in front of a cohabitant or child meet the definition of domestic abuse provided by the Family Code and are admissible as prior acts of domestic violence under section 1109. However, acts of domestic abuse under the Family Code are only admissible if they occurred within five years of the charged crime. (§ 1009, subd. (d)(3).) The act involving the dog occurred in 2009, more than five years before the 2017 murder. Thus, it should have been excluded.

In any event, the error was harmless under both the state and federal harmless error standards. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"]; *People v. Watson* (1956) 46 Cal.2d 818, 836 ["a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].) There was no question defendant killed Rutter; the question was the intent he possessed when doing so. The dog incident provided little relevance in that regard. It was one of many examples of defendant's substance-induced violence toward his significant other. In the evidence's absence, the jury still had other acts of domestic violence demonstrating defendant's propensity to commit such violence. Further, the dog incident was less severe than defendant's other acts of domestic violence and the charged murder; it did not involve violence against a person, nor did Lorlyn testify the dog was harmed. The testimony was also brief and consisted of a little under a page in the reporter's transcript. Accordingly, we are convinced beyond a reasonable doubt the error did not contribute to the jury's verdict.

B

*Any Error In The Admission Of Rutter's Statements Was Harmless*

Defendant contends the trial court abused its discretion by admitting Rutter's statements to Casey that defendant had been picking at himself and that she planned on

12

returning to the hotel to give defendant an ultimatum that he get sober or she would leave him, as well as her text message to Shawn that defendant had "been picking for 4 days straight. Hear voices n see things kinda got violent with me." Defendant argues the statements were inadmissible under section 1250 because Rutter's state of mind was irrelevant to defendant's guilt.

At the time of the court's ruling, it was unclear whether defendant was asserting a claim of self-defense. Based on the assumption defendant was arguing self-defense, the trial court ruled Rutter's statements were admissible and relevant to the question of defendant's guilt. (See *People v. Spencer* (1969) 71 Cal.2d 933, 945-946 [admission of state of mind evidence proper to rebut claim of self-defense when defendant raised factual issue regarding victim's conduct before the murder].) As the case progressed through trial, however, defendant did not argue, nor did the evidence suggest, he acted in self-defense. To the extent the court should have reconsidered its ruling, defendant's argument lacks merit because it is not reasonably probable a more favorable outcome would have resulted had Rutter's statements been excluded. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836) As defendant acknowledges, the fact he was picking at himself and hearing voices was admitted through other items of evidence. Further, Rutter's relationship with defendant was obviously tumultuous and Rutter's state of mind that she was torn about being in a relationship with him was reflected in her text messages to him. Regardless of Rutter's plan to deliver an ultimatum to defendant, the evidence demonstrates that defendant's attack upon Rutter began while she was naked and in bed after staying out late the night before. This evidence was much more probative to defendant's premeditation and deliberation than a supposed motive, which could also provide the basis for a second degree murder or manslaughter conviction.

Defendant also argues Rutter's statement that he had gotten violent with her was clearly prejudicial given the prosecution's reliance on it and the fact the jury could consider the statement for the truth. But, even if the statement were believed, it did not

13

harm defendant's theory of the case that he committed the murder as a result of methamphetamine induced psychosis and thus lacked the intent to kill. Defendant had relapsed upon coming to Sacramento and had been acting odd for quite some time. The fact he acted violently toward Rutter before the murder but after his relapse supported defendant's defense that methamphetamine induced psychosis made him act violently and he was not predisposed to commit domestic violence. Thus, while defendant's prior violent conduct toward Rutter supported the prosecution's theory he was prone to commit domestic violence, it also supported defendant's theory of the case. Because the evidence equally supported each side's theory of the case, it is not reasonably probable a more favorable outcome would have resulted in the absence of the evidence's admission. The error was thus harmless.

## II

### *Instructional Claims*

Defendant raises one instructional error claim related to the guilt phase of his trial and two instructional error claims related to the sanity phase of his trial. As to the guilt phase, he contends the trial court erred by instructing the jury it could not consider defendant's mental disease or intoxication when evaluating his incriminating statements made before and after Rutter's murder. As to the sanity phase, defendant contends the trial court erred by instructing the jury he could be placed in an outpatient program upon a finding of not guilty by reason of insanity and by instructing the jury to presume defendant sane. Because defendant argues the instructions affected his substantial rights, we will address his claims of error. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579-580.)

Instructional error claims involve questions of law and are entitled to independent and de novo review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.) We consider the challenged instructions in the context of the trial record and the instructions as a whole to determine whether there is a reasonable likelihood the jury applied the instructions in an impermissible or unconstitutional manner. (*People v. Rivera* (2019) 7 Cal.5th 306, 326.)

14

*The Trial Court Properly Instructed The Jury On What*

*It Could Consider When Evaluating Defendant's Statements*

The jury was instructed: "Here is voluntary intoxication, how it works: [¶] You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way: [¶] You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. [¶] A person is voluntarily intoxicated if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating affect or willingly assuming the risk of that affect, and you may not consider evidence of voluntary intoxication for any other purpose.

"This next instruction involves mental impairment as a defense to a specific intent crime: [¶] You have heard evidence that the defendant may have suffered from a mental disease or defect or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state; specifically, malice aforethought. If the People have not met this burden, you must find the defendant not guilty of murder."

Defendant contends this was error because the instructions did not permit the jury to consider defendant's intoxication and mental impairment when assessing his statements. Defendant relies on our decisions in *People v. McGehee* (2016) 246 Cal.App.4th 1190 and *People v. Wiidanen* (2011) 201 Cal.App.4th 526 to support his contention. Both *Wiidanen* and *McGehee* involved instructions that defendant's knowingly false statements could be evidence of consciousness of guilt. We concluded in each case that if defendant's voluntary intoxication or mental impairment prevented the defendant from knowing his statements were false, the statements were not probative

of his consciousness of guilt.  (*McGehee*, at p. 1205; *Wiidanen*, at p. 533.)  Accordingly, in *Wiidanen*, we concluded it was error for the trial court to instruct with both the consciousness of guilt instruction and an unmodified voluntary intoxication instruction (*Wiidanen*, at pp. 528, 533) and in *McGehee* we concluded it was error for the trial court to instruct with both the consciousness of guilt instruction and an unmodified mental impairment instruction (*McGehee*, at pp. 1204-1205).

Unlike *Wiidanen* and *McGehee*, defendant does not argue there were conflicting jury instructions, but is instead concerned the jury was precluded from considering the effects of his intoxication and mental impairment on his statements.  Defendant argues this was important because, not only were his statements relevant when determining his intent, they were also relevant when determining whether he made intentionally false statements to officers, and whether he "truly intended to carry out his threat to kill Ms. Rutter or his stated desire that she die."  We do not believe a reasonable reading of the jury instructions would lead to such a result.

The jury instruction pertaining to defendant's statements provided that the jury should consider the statements with all the other evidence when reaching a verdict and that it was up to the jury "to decide how much importance to give to those statements." To the extent the jury relied on the statements to show defendant lied and "truly intended to carry out his threat to kill Ms. Rutter or his stated desire that she die," as defendant posits, those worries all pertain to whether defendant acted with premeditation and deliberation.  Indeed, as defendant points out, that was the only issue in this trial.  To that end, the jury was instructed that "[i]n deciding whether the People have proved their case beyond a reasonable doubt you must impartially compare and consider all of the evidence that was received throughout the entire trial."  The jury was also told it "must decide whether a fact in issue has been proved based on all of the evidence."

A reasonable reading of the instructions informs the jury that when determining intent, the jury was not restricted to any items of evidence and could consider defendant's

16

statements, no matter when they occurred. And further, when that statement was relevant to defendant's state of mind and whether he acted with premeditation and deliberation, the jury was instructed to consider defendant's intoxication or mental impairment. Thus, the instructions accurately inform the jury to consider defendant's intoxication and mental impairment when assessing the importance of his statements. For these same reasons, defendant's assertion of federal error lacks merit.[3]

B

*The Trial Court Accurately Instructed The Jury Defendant Could*

*Be Confined In An Outpatient Program, If Appropriate*

During the sanity phase instructions, the trial court instructed the jury per defense counsel's request that "[i]f you find that the defendant was legally insane at the time of the crime, he will not be released from custody until a Court finds he qualifies for release under California law. Until that time, he will remain in a mental hospital or outpatient treatment program if appropriate. He may not generally be kept in a mental hospital or outpatient program longer than the maximum sentence available for his crime. [¶] If the State requests additional confinement beyond the maximum sentence, the defendant will be entitled to a new sanity trial before a new jury. [¶] Your job is only to decide whether the defendant was legally sane or insane at the time of the crime. [¶] You must not speculate as to whether he is currently sane or may be found sane in the future. [¶] You

---

[3]      Defendant contends cumulative error resulted from the evidentiary and instructional errors he contends occurred at trial. Not so. As we have explained, there were two potential errors that occurred at trial -- the admission of the incident involving the dog and Rutter's statements to Casey and Shawn about defendant's behavior and her plan to leave defendant unless he got sober. We have already concluded these errors were harmless when considered in isolation and further conclude they were harmless when considered together. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646 [reversal is required when the cumulative effect of multiple errors deprives the defendant of a fair trial and due process].)

17

must not let any consideration about where the defendant may be confined or for how long affect your decision in any way."

Defendant contends this was an inaccurate statement of the law because defendant could not initially be housed in an outpatient program given his murder conviction and because defendant could only be housed in an outpatient program once he met several legal hurdles, including that a court find he did not pose a danger to society. According to defendant, the instruction was misleading because the instruction did not specify the circumstances under which a person convicted of murder could be placed in an outpatient program.

We disagree that the instruction is an inaccurate statement of the law. To defendant's argument, the instruction was inaccurate because it implied defendant would be placed into an outpatient program, the instruction does not say this. The instruction says defendant will not be released from custody until he qualifies under the law and, until that time, he will remain in a state hospital or outpatient program *if appropriate*. The instruction merely informs the jury of the potential housing options available and does not imply where any given defendant will be placed upon an insanity finding. Additionally, the "if appropriate" qualification speaks to the concerns and legal hurdles defendant points to in his briefing. The language implies that the question of where defendant will be housed is multilayered and left to others to answer. Thus, the instruction was not an inaccurate statement of the law. (See *People v. Moore* (1985) 166 Cal.App.3d 540, 556-557 [the court held that whenever requested by the defense at a sanity trial, the judge should give an instruction explaining a verdict of not guilty by reason of insanity does not mean the defendant will be released from custody as if he or she had been found not guilty of the criminal act itself but will remain placed in a hospital for the mentally disordered or equivalent facility or in outpatient treatment until his or her sanity has been fully restored or until the defendant has been confined for a period equal to the maximum period of imprisonment that could have been imposed upon

18

a finding of guilty]; see also *People v. Kelly* (1992) 1 Cal.4th 495, 538 [defendant neither requested nor objected to giving an instruction based on *Moore*; "[g]iven the instruction's intent to protect the defense, we do not find it error of which the defendant can complain to give it . . . and certainly not prejudicial error"].)  Accordingly, the court had no sua sponte obligation to modify the instruction to include the conditions upon which defendant would be placed in an outpatient program.

If defendant wished for the instruction to contain more detail or elaborate on the finer points of outpatient programs, he should have requested the pinpoint instruction he advances on appeal.  That pinpoint instruction was taken from our Supreme Court's decision in *People v. DeHoyos* (2013) 57 Cal.4th 79, 145, and included that "defendant's placement in outpatient treatment would depend 'upon the seriousness of his present mental illness and the seriousness of the crimes for which he has been convicted in the guilt phase of the trial.' " (Italics omitted.)  Our Supreme Court concluded it was not error to instruct with the pinpoint language and the trial court did not need to go further by instructing with additional language the defendant proposed.  (*Id.* at pp. 146-147.)  But in that case, defense counsel requested a pinpoint instruction that included the language the court ultimately used; here, defense counsel did not.  (*Id.* at p. 145.)  Thus, while it would not have been error to give the pinpoint instruction given in *DeHoyos*, it was likewise not error to give the pattern instruction without modification when there was no request to modify it.  (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1348 [" ' "[g]enerally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language" ' "]; *People v. Guiuan* (1998) 18 Cal.4th 558, 570 [same]; see also *People v. Anderson* (2011) 51 Cal.4th 989, 997-998 [court is not required to give pinpoint instructions sua sponte]; *People v. Saille* (1991) 54 Cal.3d 1103, 1117 [" ' "pinpoint" instructions are not required to be given *sua sponte* and must be given only upon request' "].)

# C

## *The Trial Court Properly Instructed The Jury On The Presumption Of Sanity*

During the sanity phase, the trial court instructed the jury that "defendant must prove that it is more likely than not that he was legally insane when he committed the crime." Defendant argues this was error because sanity is an element of every crime that the prosecution must prove beyond a reasonable doubt. Not so.

"The 'sanity trial is but a part of the same criminal proceeding as the guilt phase' [citation] but differs procedurally from the guilt phase of trial 'in that the issue is confined to sanity and the burden is upon the defendant to prove by a preponderance of the evidence that he was insane at the time of the offense' [citation]. As in the determination of guilt, the verdict of the jury must be unanimous." (*People v. Hernandez* (2000) 22 Cal.4th 512, 521.)

Defendant acknowledges the well-settled rule that he was presumed sane after the guilt phase, and he had the burden to prove his insanity by a preponderance of the evidence. However, defendant argues *Leland v. Oregon* (1952) 343 U.S. 790 [96 L.Ed. 1302] and other cases that have previously been relied on to presume sanity and shift the burden to defendant have been impliedly overruled by *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556]; and *Jones v. United States* (1999) 526 U.S. 227 [143 L.Ed.2d 311].

This argument was rejected in *People v. Ferris* (2005) 130 Cal.App.4th 773, 780. *Ferris* held *Leland* was still controlling after *Apprendi* and *Ring*, the defendant was properly presumed sane at the sanity phrase, and the defense still had the burden to prove the defendant was insane. (*Ferris*, at p. 780.) "Defendant here attempts to characterize sanity as an element of the offense charged, when in fact the question is one of insanity *as a defense*. Insanity has not been characterized by the United States Supreme Court or California courts as an element of the offense; it is found to be in the nature of a defense that relieves defendant of culpability for his or her convictions. 'An insanity plea . . . is a

20

plea to the effect that the defendant, even if guilty, should not be punished for an offense because he [or she] was incapable of knowing or understanding the nature and quality of his or her act or of distinguishing right from wrong at the time of the offense.' [Citation.]

"*Apprendi* instructs that a state cannot disguise 'elements' by calling them enhancements or sentencing factors, when in fact they are used to impose a higher sentence than was authorized by the jury's verdict alone. The sanity portion of a trial does not involve questions of guilt versus innocence, but involves questions of criminal responsibility versus legal insanity. A finding of sanity does not increase the maximum penalty one can receive if punished according to the facts as reflected in the jury verdict alone. Neither *Apprendi* nor *Ring* in any way impliedly overrules the decisions holding that insanity is not an element of a criminal offense." (*People v. Ferris*, *supra*, 130 Cal.App.4th at p. 780, italics added.)

Defendant concedes that *Ferris* rejected his arguments that *Apprendi* and *Ring* overruled prior cases about the presumption of sanity and the burden of proof but argues that *Ferris* was wrongly decided. We disagree and conclude the trial court properly instructed the jury that defendant was presumed sane and had the burden to prove his insanity by a preponderance of the evidence.

DISPOSITION

The judgment is affirmed.

/s/<br>
Robie, J.

We concur:

/s/
Raye, P. J.

/s/
Duarte, J.

21